**GREEN MOUNTAIN ENERGY COMPANY, The New Power Company, Inc., SmartEnergy, Inc., and AES NewEnergy, Inc., Petitioners,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2002.
Decided Nov. 19, 2002.

James H. Cawley, Harrisburg, for petitioner.

Matthew A. Totino, Harrisburg, for respondent.

Thomas P. Brogan, Pittsburgh, for intervenor, PECO Energy Co.

John F. Povilaitis, Harrisburg, for intervenor, Community Energy, Inc.

BEFORE: COLINS, President Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

The Pennsylvania Public Utility Commission (PUC) asks us to quash an appeal from its Order permitting PECO Energy Company's (PECO) wind tariff to become effective before resolving anti-competition complaints. We conclude that the PUC's Order, which was entered without prejudice to outstanding complaints, was neither a final, appealable order nor an appealable collateral order. Accordingly, we quash the appeal as premature, thereby allowing the PUC to complete its investigation and hearing process.

The background for this litigation is the Electricity Generation Customer Choice and Competition Act, 66 Pa.C.S. §§ 2801–2812 (Competition Act), which restructured the provision of retail electric service in Pennsylvania by providing retail customers with access "to the competitive market for the generation of electricity." 66 Pa.C.S. § 2802(12). The Competition Act permits retail customers access to the competitive market for the generation of electricity because "[c]ompetitive market forces are more effective than economic regulation in controlling the cost of generating electricity." 66 Pa.C.S. § 2802(5).

The Competition Act distinguishes between electric distribution companies and electric generation suppliers. Rates of generation suppliers are not regulated by tariffs approved by the PUC. However, the PUC continues to regulate distribution company rates for "distribution services for new and existing customers." 66 Pa. C.S. § 2804(10). Also, distribution compa-

nies perform a default service referred to as "provider of last resort" to retail customers who decline to shop for an electric generation supplier or who have returned to their distribution company. The current controversy involves whether PECO, a distribution company, gained an improper competitive advantage over generation suppliers in the area of wind energy for its default customers.

After the Competition Act became effective, PECO negotiated a merger with Unicom Corporation, which raised various challenges. The challenges were resolved by an extensive Settlement Agreement. Part of the PECO/Unicom Settlement Agreement provided for PECO to contribute $3.5 million to a corporation which would foster a "Pennsylvania Wind Energy Program." This corporation was to develop the business relationship necessary with PECO or its affiliated generation supplier necessary "to successfully offer wind blocks to their customers." Paragraph 38 of the PECO/Unicom Settlement Agreement, Reproduced Record (R.R.) at 61(a)–62(a).

On November 29, 2001, PECO filed with the PUC a proposed Wind Energy Service Rider (Wind Tariff). The primary purpose was to provide PECO default customers the opportunity to purchase wind energy from Pennsylvania wind resources as stipulated in the PECO/Unicom Settlement Agreement. R.R. at 72(a).

The Wind Tariff was filed in accordance with § 1308(a) of the Public Utility Code (Code), 66 Pa.C.S. § 1308(a). It was treated as a non-general rate filing.[1] Section 1308(b) of the Code controls the approval of a non-general rate filing. 66 Pa.C.S. § 1308(b). Under that section, a tariff

---

1. A "non-general" rate filing affects no more than 5% of the customers and amounts to no more than 3% of the total gross annual intra-state operating revenues of the utility. *See* 66 Pa.C.S. § 1308(d).

automatically becomes effective on the proposed date by operation of law unless the PUC exercises its discretion to suspend the proposed tariff. *Id.*

On January 14, 2002, less than two weeks before the Wind Tariff was to become effective by operation of law, Green Mountain Energy Company, The New Power Company, Inc., SmartEnergy, Inc. and AES NewEnergy, Inc. (collectively Petitioners) filed a formal complaint with the PUC. The Petitioners alleged that the Wind Tariff undermined electric competition in Pennsylvania, violated the provisions of the PECO/Unicom Settlement Agreement, and violated the Competition Act.

On January 24, 2002, the PUC entered its Order allowing PECO's Wind Tariff to become effective on January 27, 2002, as originally proposed. The Order provided that the Wind Tariff was subject to the adjudication of outstanding complaints.

One day later, on January 25, 2002, Petitioners filed a Petition for Review with this Court, alleging, among other things, that the PUC's failure to exercise its discretion to suspend the Wind Tariff constituted an error of law. Petitioners also filed an application for stay. After hearing, the stay was granted by a judge of this Court. The judge specifically reserved decision on whether the PUC's Order was final, and the judge deferred resolving the appealability issue until a motion to quash was filed and argument received.

Currently before us are motions to quash, and a request for relief on the merits. Regarding the motions to quash, Petitioners claim that the PUC's order was a final order pursuant to Pa. R.A.P. 341(b)(1), or in the alternative, that it was a collateral order appealable as of right pursuant to Pa. R.A.P. 313.

## I.

Petitioners contend that the PUC's Order was final. In particular, they contend that the Order was final as to PECO because the Wind Tariff was allowed to go into effect. Also, the Order was final as to Petitioners because it permitted the Wind Tariff to go into effect before resolution of their complaint, thereby denying them a meaningful opportunity to be heard. Further, they contend that the Order visits irreversible harm upon them and upon the competitive marketplace.

A final order is any order that disposes of all claims or of all parties is expressly defined as a final order by statute. Pa. R.A.P. 341(b)(1), (2). Appeals are permitted only from final orders so as to prevent piecemeal determinations and the consequent protraction of litigation. *See Hanson v. Federal Signal Corp.*, 451 Pa.Super. 260, 679 A.2d 785 (1996); *Bell v. State Farm Mut. Auto. Ins. Co.*, 430 Pa.Super. 435, 634 A.2d 1137 (1993). The general rule that a final order is required before an appeal may be taken is fundamental to the exercise of jurisdiction by the appellate court and is rigorously applied. *Prelude, Inc. v. Jorcyk,* 695 A.2d 422 (Pa.Super.1997).

The PUC Order permitted the Wind Tariff to become effective on January 27, 2002. The Order also provided: "That this Order is without prejudice to any formal complaints timely filed against the proposed Tariff." In their discussion, a majority of the Commissioners wrote, "[h]owever, approval of this filing does not constitute a determination that this filing is lawful, just, or reasonable, but only that further investigation or suspension does not appear to be warranted at this time; . . . ."

On its face, the Order and accompanying discussion do not appear to be final. In

particular, the litigation is not ended, and Petitioners' complaint is not resolved. Further, no party is out of the litigation.

In *Pa. Coal Mining Ass'n v. Insurance Dep't*, 471 Pa. 437, 370 A.2d 685 (1977), the Supreme Court held, in part, that deeming of insurance rates into effect subject to later hearing did not violate due process protections. Subsequently commenting on the decision, we observed that the deeming of rates into effect subject to later challenge did not constitute final approval of the rates. *Barasch v. Pa. Pub. Util. Comm'n*, 119 Pa.Cmwlth. 81, 546 A.2d 1296, 1306 (1988) (en banc). Likewise, here, permitting the Wind Tariff to take effect without suspension subject to later resolution of Petitioners' complaint is not final.

 Contending that they are effectively out of the litigation because after the Wind Tariff goes into effect they have no stake in contesting it, Petitioners argue that the PUC's decision not to suspend the Wind Tariff had the effect of a final order. However, the level of Petitioners' motivation is not a basis upon which appellate jurisdiction can be found, nor does the intensity of Petitioners' interest in litigation transform an interlocutory order into a final order.

Petitioners forcefully argue that their competitive position and the health of the entire electric generation marketplace is so compromised by the entry of a distribution company into a realm reserved for generation suppliers as to amount to irreparable harm. This argument is insufficient to create appellate jurisdiction where none otherwise exists. In other words, the perceived importance of the cause does not authorize a vault over the fact finder into an appellate court.

This approach is consistent with our decision in *Columbia Gas of Pa., Inc. v. Pa. Pub. Util. Comm'n*, 104 Pa.Cmwlth. 142, 521 A.2d 105 (1987) (en banc). In that dispute between gas utilities over customer displacement, an administrative law judge decreed a preliminary injunction pending full litigation over one utility's complaint. The case was certified to this Court as an interlocutory appeal. This Court quashed the appeal. Writing for the Court, President Judge Crumlish specifically rejected the argument that the decision on interim relief should be treated as a final adjudication because of the severity of its impact on gas utility competitions. *Id.* at 108–09. In declining to assume appellate jurisdiction "because of the ramifications and potentially harmful effects of the Commission order," this Court stated:

> However, we believe that the proper forum for discussion, clarification and application of a customer migration policy is the Commission. Whether the public interest factors are discussed and heard by the administrative law judge or, as suggested by the Commission's counsel at argument, in a separate declaratory action before the Commission, a fully developed record is needed to aid the Commission and this Court in deciding on the legality of such action.

*Id.* at 110. Our current analysis is consistent with this authority.

For the foregoing reasons, we reject Petitioners' contention that the PUC Order is a final order within the meaning of Pa. R.A.P. 341(b).

## II.

Alternatively, Petitioners contend that the Order was a collateral order appealable as of right pursuant to Pa. R.A.P. 313. In particular, they contend that the due process and statutory entitlement arguments arising because the Wind Tariff went into effect before full hearing are

separable from and collateral to Petitioners' main causes of action.

Pa. R.A.P. 313 provides:

(a) General Rule. An appeal may be taken as of right from a collateral order of an administrative agency or lower court.

(b) Definition. A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

■ The rule allowing appeal from collateral orders must be applied narrowly. *Geniviva v. Frisk*, 555 Pa. 589, 725 A.2d 1209 (1999); *Watson v. City of Philadelphia*, 665 A.2d 1315 (Pa.Cmwlth.1995). Narrow application prevents the collateral order doctrine from subsuming the fundamental general precept that only final orders are appealable and from causing litigation to be interrupted and delayed by piecemeal review of trial court decisions. *Watson.* To benefit from the collateral order doctrine of appealability, an interlocutory order must satisfy all three of the definitional elements set forth in the governing rule of appellate procedure. *Nemirovsky v. Nemirovsky*, 776 A.2d 988 (Pa.Super.2001).

■ Regarding the first definitional element, separability, an order must not be of such an interlocutory nature as to affect, or be affected by, the merits of the main cause of action. *Smitley v. Holiday Rambler Corp.*, 707 A.2d 520 (Pa.Super.1998). We must decide whether the issues appealed can be addressed without analysis of the underlying claims on the merits. *See Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547 (1999) (issue of privilege raised in discovery request can be addressed without analysis of underlying claim of professional negligence).

■ On the separability element, Petitioners contend that whether the Wind Tariff should be suspended is separable from whether the Wind Tariff should be ultimately approved. However, as part of arguments both on appealability and on the merits of their appeal, Petitioners urge an analysis of irreparable competition suppression. Moreover, even a cursory reading of Petitioners' submissions persuades us that they actually seek a decision on the merits reversing the PUC.[2] Insofar as Petitioners invite an analysis essential to the merits, the Order is not a separable, collateral order as defined in Pa.R.A.P. 313.[3] Otherwise we would tolerate the interruption and delay caused by piecemeal review that the collateral order doctrine seeks to avoid.

**2.** For example, Petitioners argue:

A remand to the Commission is therefore required, but, even then, especially given the almost unanimous PUC vote ..., Petitioners in the strongest terms request the Court to adjudicate the central issue of this case whether it is proper under the Competition Act for an EDC to market a competitive generation product to its captive default customers.

Brief of Petitioners at 25 (footnote omitted). Also, Petitioners argue:

If, on the other hand, the Court determines that the Order was a collateral order, then only the procedural due process and statu-

tory hearing entitlement issues are before it (although for the reasons stated on page 25–26 of Petitioners' merits' brief, it is vital that the Court, in addition to remanding the case and staying the tariff while a meaningful opportunity to be heard is afforded, give guidance on the law as well).

Brief in Opposition to Motions to Quash or Dismiss at 10 (footnote omitted).

**3.** Because of our resolution of the first element of the collateral order definition, we need not address whether Petitioners have satisfied the other two elements, importance of issue and irreparable loss.

For the foregoing reasons, we hold that the PUC Order is neither a final order nor a collateral order, and we quash the appeal, thereby allowing the PUC to complete its investigation and hearing process.

Judge McGINLEY did not participate in the decision in this case.

### ORDER

AND NOW, this 19th day of November, 2002, the Motions to Quash are GRANTED. Jurisdiction is relinquished.

DISSENTING OPINION BY Judge LEADBETTER.

Because I believe that the salient issue in this case is not whether PECO's Wind Tariff should be approved but whether the PUC should treat a proposal of this nature as a routine non-general rate filing, I must respectfully dissent.

By quashing the instant appeal on the basis that the former issue is not ripe for appellate review, a conclusion with which I fully agree, the majority assures that the latter issue will evade appellate review. By the time a final order on the tariff reaches this court, the procedural question will be moot. Nonetheless, the issue of the proper scope of the Commission's discretion over a non-general rate filing that may have far-reaching impact on competition is both of great public importance and quite separable from and collateral to the merits. Under Pa. R.A.P. 313(b), an interlocutory order is appealable as of right where it raises an issue which is "separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." *See also Pugar v. Greco*, 483 Pa. 68, 73, 394 A.2d 542, 545 (1978) [citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)].

While here, it may well be argued that petitioners' rights will not be irreparably lost if this appeal is quashed, it seems probable that important public interests will be. In these circumstances, the interlocutory appeal should be heard.

As the majority explains, the Wind Tariff was filed as a non-general rate filing under Section 1308 of the Public Utility Code, 66 Pa.C.S. § 1308. Because non-general rate filings are those which affect no more than 5% of the customers and amount to no more than 3% of the total gross annual intrastate operating revenues of the utility, they may ordinarily be expected to be of lesser significance than general rate filings. Hence, they go into effect automatically unless the PUC takes affirmative action to suspend their implementation pending an investigation.

Here, however, the proposed tariff is not of minor import. As Commissioner Fitzpatrick documents in his persuasive dissenting opinion, this proposed tariff could have substantial negative impact on competition. He states:

The goal of this tariff filing is to promote wind power generated in Pennsylvania. This is a laudable goal. Our duty, however, is to implement the laws administered by this Commission—in this case, the Electricity Generation Customer Choice and Competition Act, 66 Pa.C.S. § 2801 *et seq.* Under this law, our primary focus should be upon the impact of the filing on electricity competition, rather than upon promotion of renewable energy per se.

With regard to the impact of this filing on competition, it is clear that the tariff will encourage some customers to remain on PECO's PLR service. I recognize a customer's right to remain on PLR service; however, our current situation is that the vast majority of customers are on such service over three years after the initiation of competition.

This raises the question whether our effort to introduce electricity competition is succeeding. The shopping statistics compiled by the Office of Consumer Advocate[1] show that the number of customers and amount of load participating in the competitive market have dropped substantially since competition began. In April 2000, the number of residential customers who were shopping was 429,670; by January 2002, that number had dropped to 303,120.[2] The number of commercial customers who were shopping in April 2000 was 101,153; by January 2002, that number had dropped to 20,045. The number of industrial customers shopping in April 2000 was 4,622; that number had dropped to 592 by January 2002. These numbers are borne out by an analysis of the percentage of electric load in Pennsylvania purchased from alternative suppliers. As the attached chart demonstrates, this percentage has dropped from roughly 35% in April 2000 to less than 10% currently.

I might view this matter with less concern if retail competition in Pennsylvania [were] vibrant and growing, but the above numbers demonstrate that it is not. Given that reality, a more prudent course of action on this filing would be to suspend and investigate it to determine whether it is consistent with the Competition Law and to make sure that the filing is implemented in a manner which minimizes any negative impact upon the competitive marketplace.

I am not philosophically opposed to incumbent utilities offering something other than a "plain vanilla" generation service offering. But the Commission should consider such proposals carefully, especially given the state of our competitive market. Based upon these considerations, I believe that the appropriate course of action on this filing would be to suspend and investigate it.

[1] These statistics are available on OCA's website—"www.oca.state.paus."

[2] The 303,120 number excludes 227,349 residential customers in the competitive default service program in the PECO service territory. Under this program, which was initiated in early 2001, customers were assigned to an alternative supplier (at a slightly lower price) unless they opted out of the program. Excluding these customers from the January 2002 shopping total is appropriate for an "apples-to-apples" comparison with the April 2000 shopping numbers.

*Pennsylvania Public Utility Comm'n v. PECO Energy Co.*, Docket No. R-00016938, 2002 WL 480583 Dissenting Statement of Commissioner Fitzpatrick at 2 (January 24, 2002).

I agree, and thus believe the PUC abused its discretion in allowing this proposed tariff to go into effect without investigation. Accordingly, I would reverse and remand for further proceedings prior to its implementation.