**Donald BROPHY**

v.

**PHILADELPHIA GAS WORKS AND PHILADELPHIA FACILITIES MANAGEMENT CORPORATION.**

**Appeal of: Philadelphia Gas Works, Philadelphia Facilities Management Corporation and Donald Brophy.**

Commonwealth Court of Pennsylvania.

Argued March 5, 2007.

Decided April 5, 2007.

Thomas More Marrone, Philadelphia, for appellant, Donald Brophy.

Neil S. Witkes and Kathleen Campbell, Bala Cynwyd, for appellants, Philadelphia Gas Works and Philadelphia Facilities Management Corporation.

No appearance entered on behalf of appellee.

BEFORE: LEADBETTER, President Judge, SIMPSON, Judge, McCLOSKEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this joint appeal, Donald Brophy, plaintiff below (Plaintiff), and the Philadelphia Gas Works and Philadelphia Facilities Management Corporation (collectively, PGW), defendants below, (Plaintiff and PGW are collectively referred to as Co–Appellants) ask whether the Court of Common Pleas of Philadelphia County (trial court) abused its discretion by granting preliminary approval to their proposed class action settlement agreement, but noting it would not grant final approval unless a sufficient number of class members expressed their willingness to participate in the settlement. Because we conclude the trial court's order is neither a final, appealable order nor an appealable collateral order, we quash the appeal.

By way of brief factual background, from the 1950's until the mid–1970s, PGW installed numerous natural gas pressure regulators with mercury seal release valves in residences throughout the City of Philadelphia.

Beginning in 1980, with the advent of new technology, PGW began replacing the mercury regulators with mercury-free regulators. Currently, PGW proactively seeks out mercury regulators still in use and replaces them with mercury-free regulators. To date, PGW removed and replaced approximately 12,000 mercury regulators from homes in the City.

Studies show the presence of an intact mercury regulator poses no health or safety risk to home occupants. However, removal of a mercury regulator, if done improperly, can pose the risk of a spill, creating health and safety risks, including mercury contamination disease, brain damage, and death.

In January 2004, Plaintiff and Johannah

Casey[1] initiated a class action suit against Defendants, alleging they and others similarly situated sustained damages as a result of PGW's removal of mercury regulators from homes in the City from 1980 to the present. Plaintiff sought relief under theories of negligence and strict liability, as well as Pennsylvania's Hazardous Sites Cleanup Act (HSCA).[2]

In March 2004, Plaintiff filed a first amended class action complaint restating his claims under the HSCA and eliminating the negligence and strict liability claims. Through his complaint, Plaintiff alleged PGW's procedures for removing mercury regulators were so deficient that, each and every time PGW removed a mercury regulator, there was a "threatened release" of mercury under the HSCA, triggering liability under the statute. Plaintiff brought suit, for himself and others, to obtain court-ordered testing of every home from which PGW removed a mercury regulator to determine whether there was an actual spill when the regulator was removed. In his complaint, Plaintiff stated his belief that PGW removed a mercury regulator from his home in 1997, but alleged he was uncertain if an actual spill of mercury occurred.

Although Plaintiff claimed a serious and significant risk of mercury exposure in homes that had mercury regulators removed and also a continuing threat to customers whose regulators have yet to be removed, no testing or other sampling of homes to determine the extent of the risk was conducted in the City.

Nevertheless, the record below reveals sampling performed in homes in Detroit, Michigan and Chicago, Illinois, where mercury regulators were removed using similar procedures, found unreported mercury spills occurred in .5% of the homes. If the Philadelphia experience is comparable, 60 homes already had mercury spilled during removal. However, no analysis, sampling or testing was performed to determine whether the spill percentages in Detroit and Chicago are comparable to Philadelphia, or whether PGW personnel were more or less careful in performing removal or more or less diligent in reporting minor spills. In addition, no testing was ever performed to determine whether Plaintiff's home has any detectable mercury.

After the close of the pleadings, the parties conducted discovery. In addition, the trial court held a three-day class certification hearing at which the parties presented multiple fact and expert witnesses. Pending class certification, the parties initiated settlement discussions. In April 2005, the parties engaged in formal settlement discussions before a mediator, after which they agreed on the principal terms of a proposed settlement.

After reviewing the terms of the proposed settlement agreement, the trial court conducted a conference with the parties and suggested they renegotiate. Thereafter, the parties engaged in additional negotiations and executed an amended settlement agreement. Upon review, the trial court recommended the parties renegotiate certain provisions. After further discussions, the parties executed a second amended settlement agreement (Settlement Agreement), which is at issue here.

The Settlement Agreement provides for conditional certification of three settlement classes. Pursuant to the terms of the

---

1. In October 2004, the trial court entered summary judgment against Johannah Casey, and the case proceeded with Brophy as the sole named plaintiff.

2. Act of Oct. 18, 1988, P.L. 756, *as amended,* 35 P.S. §§ 6020.101–6020.1305.

Settlement Agreement, all members of the "Site Testing Class" (comprised of those individuals who currently own or occupy homes from which PGW removed a mercury regulator) would be offered testing at a cost of $60.00 per household to determine if mercury was spilled during PGW's removal of the mercury regulators from their homes. To accommodate low income individuals, any member of the site testing class whose income is at or below 150% of the 2005 federal poverty guidelines, and who registers or has registered for PGW's program for low-income assistance will be offered testing at a cost of $10.00. PGW will pay the remaining cost of site testing ($180.00 or $230.00, respectively), for a total cost of $240.00 per home.

In October 2005, the parties submitted a joint motion for preliminary approval of the Settlement Agreement to the trial court. In response, the trial court issued an opinion in which it framed the issue as "whether [the Settlement Agreement] can be considered within the 'range of reasonableness'[3] to require concerned families which have had mercury regulators removed pursuant to less than optimal procedures to pay [$60.00] for testing at a time when gas rates for home heating have skyrocketed." Tr. Ct., Slip Op., 4/13/06 at 2. Responding to this issue, the trial court stated:

This heating season, the Pennsylvania Public Utility Commission approved a 19.4% gas rate increase. Although Federal fuel oil support is being reduced and the cost of heating fuel is increasing the parties have agreed to settle a claim allegedly involving serious health risks with only partial payment for hazardous material testing. PGW has agreed to pay [$180.00] on behalf of every customer who individually pays [$60.00]. The settlement affords no relief to families who choose not to or cannot afford to pay [$60.00]. The settlement does provide a full release for all cleanup or property damage claims for defendant PGW. The settlement does guarantee to [P]laintiff's law firm a fee of [$425,000] and to the named [P]laintiff [$3,000] regardless of the number of households which elect to pay [$60.00]. The settlement further provides that for even those customers living at the extreme poverty level and therefore are eligible for Federal assistance must pay [$10.00] or no testing will be performed.

The court must consider the effect of this proposed settlement upon those working families living in Northeast, North, and Northwest Philadelphia who while ineligible for federal assistance nonetheless are struggling to make ends meet. Gas price increases may force class member households to choose between taking a child to the doctor, having heat in their homes or learning whether PGW's negligence has created dangerously high mercury levels in their home by paying [$60.00] for testing.

Thus, this settlement, notice of which will necessarily raise community awareness and concern for the potential of mercury poisoning among families in homes in Oak Lane and Olney where regulators have been or will be removed, affords our least fortunate members of society either a Hobson's choice or no remedy whatsoever.

It is simply unreasonable to require the most unfortunate in society, those least capable of protecting themselves, households which unfortunately number in the thousands in the affected area, to

**3.** *Dauphin Deposit Bank Trust Co. v. Hess (Dauphin II)*, 556 Pa. 190, 727 A.2d 1076 (1999).

pay [$60.00] for testing necessitated solely by PGW's inadequate mercury removal procedures. These considerations lead inevitably to the conclusion that the proposed settlement should be rejected.

Tr. Ct., Slip Op. 4/13/06 at 2–3 (footnotes omitted).

Ultimately, the trial court stated:

[B]ecause the actual effect of the proposed settlement will be to heighten fear of and concern for mercury contamination while not affording any real opportunity for reassurance by families on fixed incomes or otherwise struggling financially, the Court believes only a miniscule fraction of class members will receive any benefit whatsoever. *This reasoning leads inevitably to the conclusion that the settlement should be rejected.*

*However, the Court may be mistaken.* Perhaps overwhelming numbers of class members can afford and are willing to spend [$60.00] to achieve peace of mind or remediation. Perhaps even struggling families will believe that [$60.00] is a small price to pay to insure their babies are not breathing mercury vapor. Perhaps responsible landlords will pay to insure the health of their tenants and safety of their property. *Fortunately, this Court need not make an all or nothing prediction on inadequate data.*

*The Court would approve a settlement which provides that all who do not avail themselves of the remedy by paying [$60.00] are thereby opted out. The Court would approve a settlement with an appropriate co-pay. The court will* approve a settlement which allows tenants to pay if their landlords do not. *Alternatively, the Court will preliminarily approve the proposed settlement in the hope that experienced counsel do know their class members. Rather than prejudge the effect of a [$60.00] fee, the Court will preliminarily approve the settlement but will require participation results before deciding on final approval. Counsel are advised that this Court will deny final approval if the [$60.00] fee proves to be a significant impediment to participation or significant disincentive for families to request testing.*

Accordingly, in the spirit of the settlement as agreed upon, preliminary approval is granted conditioned upon the requirement that the initial notice provide both the option for opting out of the settlement, the option of agreeing to pay [$60.00] for testing and the opportunity for class members to explain why they cannot afford the co-pay. The notice shall also fully and accurately inform recipients in plain English of the dangers of exposure to mercury so they may make an informed decision. *Final approval will be granted only if a sufficient number of class members have affirmatively expressed their willingness to make the payment.*

Tr. Ct., Slip Op. 4/13/06 at 6–8 (emphasis added). Co–Appellants filed a joint notice of appeal to this Court[4] and submitted a joint brief in support of their appeal.

---

**4.** The trial court subsequently issued a second opinion in which it noted its responsibility in determining whether to approve a proposed class settlement is to protect class members whose rights may not have been properly or fully represented by the negotiating parties. *See Officers for Justice v. Civ. Serv. Comm'n of City & County of San Francisco,* 688 F.2d 615 (9th Cir.1982). Consistent with this principle, the trial court reiterated its instruction that it would only grant final approval if a sufficient number of class members indicated their willingness to participate "in order to properly protect class members who lack the ability to do so." Tr. Ct., Slip Op., 8/22/06 at 8.

On appeal,[5] Co–Appellants argue the trial court abused its discretion by improperly rewriting the terms of the Settlement Agreement when it conditioned final approval on an unspecified number of class members submitting valid proofs of claim. Co–Appellants also assert the trial court abused its discretion by conditioning final approval of the Settlement Agreement on an unspecified level of class participation. Specifically, they contend the trial court erred in: disregarding the limited role of a reviewing court in evaluating a settlement agreement for preliminary approval; failing to attach a presumption of fairness to the proposed settlement; basing its decision on unsupported assumptions regarding social and economic factors; and, ignoring evidence of the reasonableness of the settlement.

Before addressing Co–Appellant's issues, we first consider whether the trial court's order, which *granted preliminary approval* of the Settlement Agreement, is a final order subject to our review. Because the question of appealability implicates this Court's jurisdiction, a non-waivable matter, we are not only permitted, but required to determine if the trial court's order is appealable. *See In re Nader*, 588 Pa. 450, 905 A.2d 450 (2006), *cert. denied sub nom., Nader v. Serody,* — U.S. —, 127 S.Ct. 995, 166 L.Ed.2d 712 (2007); *Giovagnoli v. State Civ. Serv. Comm'n (Monroe County Children Youth Servs.)*, 581 Pa. 655, 868 A.2d 393 (2005); *Larock v. Sugarloaf Twp. Zoning Hearing Bd.*, 740 A.2d 308 (Pa.Cmwlth.1999).

Ordinarily, a final order is any order that disposes of all claims and of all parties or is expressly defined as a final order by statute. Pa. R.A.P. 341(b)(1), (2). Appeals are permitted only from final orders so as to prevent piecemeal determinations and the consequent protraction of litigation. *See Green Mountain Energy Co. v. Pa. Pub. Util. Comm'n,* 812 A.2d 740 (Pa.Cmwlth.2002) (*en banc* ); *Hanson v. Fed. Signal Corp.,* 451 Pa.Super. 260, 679 A.2d 785 (1996); *Bell v. State Farm Mut. Auto. Ins. Co.,* 430 Pa.Super. 435, 634 A.2d 1137 (1993). The general rule that a final order is required before an appeal may be taken is fundamental to the exercise of jurisdiction by the appellate court and is rigorously applied. *Prelude, Inc. v. Jorcyk,* 695 A.2d 422 (Pa.Super.1997).[6]

Here, Co–Appellants do not assert the trial court's order is a final, appealable order within the meaning of Pa. R.A.P. 341(b). Instead, relying on *Treasurer of State of Connecticut v. Ballard Spahr Andrews & Ingersoll LLP,* 866 A.2d 479 (Pa. Cmwlth.2005) (*en banc* ), they contend that orders disapproving settlements in class action cases are immediately appealable under the collateral order rule. Co–Appellants argue here the trial court's order, although styled as an order granting preliminary approval, has the practical effect of disapproving the Settlement Agreement by conditioning final approval on an unknown number of class members submitting claim forms. As such, Co–Appellants assert, the trial court's order amounts to a

5. The question on appeal from an order approving or disapproving a class action settlement is whether the trial court abused its discretion in reaching its decision. *Buchanan v. Century Fed. Sav. Loan Ass'n,* 259 Pa.Super. 37, 393 A.2d 704 (1978). Generally, an appellate court will find an abuse of discretion if the record shows, "the law has been overriden or misapplied, or that the judgment exercised by the [c]ourt was manifestly unreasonable or motivated by partiality, prejudice, bias or ill-will." *Id.* at 709.

6. We recognize, of course, some interlocutory appeals may be taken as of right, *see* Pa. R.A.P. 311, or by permission. *See* Pa. R.A.P. 312. However, Co–Appellants do not claim this appeal falls within either of these rules.

*de facto* disapproval and, therefore, as in *Ballard Spahr*, the order is appealable under the collateral order rule. We disagree.

■ The collateral order rule, upon which Co–Appellants rely, is codified in Pa. R.A.P. 313, which states:

(a) General Rule. An appeal may be taken as of right from a collateral order of an administrative agency or lower court.

(b) Definition. A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Thus, an immediate appeal is permitted under the collateral order rule where: (1) the order is separable from and collateral to the main cause of action; (2) the right involved is too important to be denied review; and, (3) the question presented is such if review is postponed until final judgment, the claim will be irreparably lost. *Vaccone v. Syken*, 587 Pa. 380, 899 A.2d 1103 (2006).

■ As an exception to the rule of finality, the collateral order doctrine is to be interpreted narrowly, and "each prong of the collateral order doctrine must be clearly present before an order may be considered collateral." *Melvin v. Doe*, 575 Pa. 264, 272, 836 A.2d 42, 47 (2003); *see also Geniviva v. Frisk*, 555 Pa. 589, 725 A.2d 1209 (1999); *Stahl v. Redcay*, 897 A.2d 478 (Pa.Super.2006); *Green Mountain Energy Co.* Narrow application prevents the collateral order rule from subsuming the fundamental general precept that only final orders are appealable and from causing litigation to be interrupted and delayed by piecemeal review of trial court decisions. *Green Mountain Energy Co.* Indeed, "the requirements for an appealable collateral order remain stringent in order to prevent undue corrosion of the final order rule." *Melvin*, 575 Pa. at 272, 836 A.2d at 47.

■ As to the first definitional element, separability, an order must not be of such an interlocutory nature as to affect, or be affected by, the merits of the main cause of action. *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547 (1999). Thus, it is necessary to decide whether the issues appealed can be addressed without analysis of the underlying claims on the merits. *Id.*

■ Regarding the second definitional element, an order involves a "right too important to be denied review" only if it is "deeply rooted in public policy going beyond the particular litigation at hand." *Geniviva*, 555 Pa. at 598, 725 A.2d at 1214 (trial court order refusing to approve a settlement only implicated rights important to the parties to the particular settlement and did not involve important public policy issues of general concern; thus, order was unappealable). *See* 20 G. Ronald Darlington, et al., Pennsylvania Appellate Practice §§ 313:2, 313.113.1 (2006 ed.).

■ With regard to the third element, a claim will be "irreparably lost" if review is postponed only if it can be shown the issue involved will not be able to be raised on appeal, if appeal is delayed. *See Keefer v. Keefer*, 741 A.2d 808 (Pa.Super.1999).

■ Here, despite asserting the trial court's order is an appealable collateral order, Co–Appellants offer no analysis of the applicability of the three definitional elements. As explained below, we do not believe the trial court's order is appealable under the collateral order rule.

As to the second element, we do not believe the right involved is too important to be denied review or the question presented is such that the claim will be irrepa-

rably lost if review is postponed. More particularly, as noted, our Supreme Court holds an order involves a "right too important to be denied review" only if it is "deeply rooted in public policy going beyond the particular litigation at hand." *Geniviva,* 555 Pa. at 598, 725 A.2d at 1214. Here, the trial court's order granting preliminary approval of the Settlement Agreement subject to a showing of sufficient class participation before final approval "implicates no policy interests of sufficient import that immediate appeal [i]s required." *Id.* at 599, 725 A.2d at 1214.

▮▮▮▮ Additionally, with regard to the third element, we do not believe Co–Appellants' claim will be irreparably lost if review is postponed. Initially, we observe that a trial court's approval of a class action settlement as fair involves a two-step process. *Milkman v. Amer. Travellers Life Ins. Co.,* 2001 WL 1807376 at *11–12 (C.P.Phila.) (citing MANUAL FOR COMPLEX LITIGATION 3d 30.41 at 265–68); *In re Nasdaq Market–Makers Antitrust Litig.,* 176 F.R.D. 99 (S.D.N.Y.1997). First, counsel submit the proposed terms of settlement and the court makes a preliminary fairness evaluation. *Id.* If the court has reservations, it may advise the parties, who may wish to resume negotiations in an effort to remove potential obstacles to approval. *Id.* If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, and appears to fall within the range of possible approval, the court should commence the second step and direct notice be given to the class members of a formal fairness hearing. *Id.* At the formal fairness hearing, arguments and evidence may be presented in support of and in opposition to the settlement. *Id.*

Indeed, a court cannot approve a class settlement without first notifying the class and conducting a hearing to allow objectors to be heard and to determine the fairness and adequacy of the settlement. *See Greenfield v. Villager Indus., Inc.,* 483 F.2d 824, 831–33 (3d. Cir.1973).

Here, the trial court issued an order granting preliminary approval of the Settlement Agreement. Therefore, notice will be given to the class members of a formal fairness hearing at which arguments and evidence may be presented in support of and in opposition to the Settlement Agreement. Following notice and a formal fairness hearing, the trial court will consider whether to grant final approval. After the trial court makes a determination as to whether to grant or deny *final approval* of the Settlement Agreement an appeal may be taken. Because review of the trial court's decision to approve or disapprove the parties' proposed settlement may be undertaken after the final approval stage, Co–Appellants challenge to the propriety of such a determination will not be irreparably lost. For these reasons the trial court's order does not meet the second and third prongs of the test for collateral orders.

Contrary to Co–Appellants' contentions, our decision in *Ballard Spahr* does not compel a different result. There, we considered whether a trial court order denying final approval of a settlement in a derivative action [7] was appealable. This Court stated:

On the question of the immediate appealability of the trial court's order and therefore of this Court's jurisdiction to review this matter, the Court accepts the explanation offered by both parties

---

7. Like a class action, a derivative action may be settled only with the approval of the court.

*See* Pa. R.C.P. No. 1506(d); *Ballard Spahr.*

that the Superior Court's analysis in *Buchanan v. Century Fed. Sav. Loan Ass'n,* [393 A.2d 704 (Pa.Super.1978) ], is equally applicable here. In *Buchanan,* the court concluded that an order disapproving a class action settlement was immediately appealable under the Supreme Court's decision in *Bell v. Beneficial Consumer Discount Co.,* 465 Pa. 225, 348 A.2d 734 (1975), establishing the "collateral order" doctrine, which was later formalized in Pa. R.A.P. 313.[A]n order denying approval of a settlement disposes of a matter separate from the merits of the case and is too important to be denied review.

*Id.* at 483–84 (emphasis added).

*Ballard Spahr* is distinguishable here. First and foremost, unlike the order in *Ballard Spahr* (or the order in *Buchanan* upon which the Court relied), which *denied final approval* of a proposed settlement, the trial court's order here *granted preliminary approval* of the proposed settlement. As noted, based on the trial court's decision to grant preliminary approval, the court approval process will proceed with notice of the Settlement Agreement provided to class members and the scheduling of a formal fairness hearing. Following notice and a hearing, the trial court will consider whether to grant or deny final approval, after which any aggrieved party may appeal. Additionally, unlike in *Ballard Spahr,* where we determined the order at issue was appealable under the collateral order rule, the trial court's order here is not an appealable collateral order because it does not satisfy the second and third elements of the definitional test.

Of further import here, Co–Appellants do not direct our attention to any appellate authority, federal or state, reviewing a trial court's decision to grant or deny *preliminary approval* of a proposed class settlement (prior to dissemination of notice to class members and a formal fairness hearing). In fact, the only appellate authority we located holds to the contrary. In *McAllen Medical Center, Inc. v. Cortez,* 66 S.W.3d 227 (Tex.2001), the Supreme Court of Texas expressly declined to review a trial court granting preliminary approval of a proposed class settlement on the grounds the matter was not ripe for review until final approval was granted or denied. The Court stated:

Unlike the trial court's decision to certify a class action, which immediately and directly impacts the proceedings' course with possibly irremediable consequences, *the trial court's preliminary approval of the settlement has no binding force. Rather, the settlement does not gain legal effect until the trial court gives its final approval. The trial court has a duty at the fairness hearing to examine the proposed settlement thoroughly, with input from objectors, and may approve the settlement only if the court determines that it is fair. Until then, the proposed settlement's terms do not affect the parties or the proceedings, and appellate review is premature.*

*Id.* at 232 (citations omitted) (emphasis added). Here, Co–Appellants seek review of a trial court order granting preliminary approval of a proposed settlement prior to notice to class members and a formal fairness hearing. Under these circumstances, we find the rationale employed by the Supreme Court of Texas applicable. *Accord Peters v. Blockbuster, Inc.,* 65 S.W.3d 295 (Tex.App.2001); *see also In re Vitamins Antitrust Litig.,* 2000 WL 673936 (D.D.C.) (unreported) (District Court recognized its order granting preliminary approval to a class settlement was interlocutory and denied an application to certify its order for permissive interlocutory appeal).

Additional support for our conclusion that the trial court's order is unappealable

here is found in our Superior Court's decision in *Pennsylvania Orthopaedic Society v. Independence Blue Cross*, 885 A.2d 542 (Pa.Super.2005), *petition for allowance of appeal denied*, 586 Pa. 771, 895 A.2d 1262 (2006). There, our Superior Court held a trial court order tentatively approving a proposed class action settlement was not an appealable, final order. The Court explained:

> Initially we address the appealability of the matter before us. The appeals in this matter were taken following the trial court's [April 2004] order. The April order was not final. While it approved the settlement agreement, it also invalidated the existing opt-outs and allowed for a new opt-out period. Depending on the number of individual members of the class who elected to opt out at the conclusion of the second opt-out period, the defendants had the ability to void the settlement agreement. Thus, the members of the class were not yet determined and the entire settlement agreement had the potential of being voided at the discretion of one of the parties upon notice of the number of valid opt-outs in the new period following the April order. Accordingly, the April order was not final and appealable pursuant to Pa. R.A.P. 341(b), as it did not terminate the action or dispose of all parties and all claims.
>
> *In this case the April order was not an announcement of a final determination which required only the entry of a formal judgment to become appealable. Rather, the April order only preliminarily approved the settlement, which, as described above, was capable of being voided at the discretion of the defendants should the opt-outs exceed the stated percentage.* The fact that the stated percentage of opt-outs was ultimately not reached and that the settlement agreement was not voided did not

render the April order final and an appeal therefrom proper upon entry of the "final order" and "judgment". *Simply stated, the appeals in this matter were filed prematurely following a non-final order.*

*Id.* at 545–46 (emphasis added).

A comparison of this case and *Pennsylvania Orthopaedic* is instructive. Here, as in that case, the trial court's order granted *preliminary approval* to the Settlement Agreement. Further, here, as in that case, because notice of the Settlement Agreement was not yet provided to class members, members of the class have not yet been determined. In addition, PGW here, like the defendants in *Pennsylvania Orthopaedic*, retains the option to terminate the Settlement Agreement if 600 or more class members opt out. Reproduced Record (R.R.) at 597a–98a. Thus, here, as in *Pennsylvania Orthopaedic*, depending on the number of class members who elect to opt out, PGW could elect to void the agreement. Consequently, our Superior Court's decision in *Pennsylvania Orthopaedic* lends additional support to our conclusion that the trial court's order is not appealable here.

In sum, we conclude the trial court's order granting preliminary approval of the Settlement Agreement is neither a final order nor a collateral order, and, therefore, we quash the appeal.

### ORDER

AND NOW, this 5th day of April, 2007, the appeal in the above-captioned matter is hereby **QUASHED.** Jurisdiction relinquished.